Rel: April 25, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

————————————————

### CL-2024-0982

————————————————

### B.T.

### v.

### Jefferson County Department of Human Resources and Legal Aid Society of Birmingham

### Appeal from Jefferson Juvenile Court, Bessemer Division
### (JU-21-387.02)

LEWIS, Judge.

B.T. ("the father") appeals from a judgment entered by the Jefferson Juvenile Court, Bessemer Division ("the juvenile court") terminating his parental rights to B.L.T. ("the child"), who was born in August 2021. We affirm the juvenile court's judgment.

## Procedural History

This case has previously been before this court. See <u>B.T. v. Jefferson Cnty. Dep't of Hum. Res.</u>, [Ms. CL-2023-0944, Aug. 30, 2024] ___ So. 3d ___ (Ala. Civ. App. 2024). In <u>B.T.</u>, we set out the pertinent procedural history as follows:

> "On January 9, 2023, the Jefferson County Department of Human Resources ('DHR') filed in the juvenile court a petition seeking to terminate the parental rights of B.K. ('the mother') and of the father to the child. A trial on the petition was held on November 8, 2023. On December 11, 2023, the juvenile court entered a final judgment terminating the parental rights of the mother and of the father to the child. The juvenile court's final judgment provided, in pertinent part:

>> "'The Court does find, pursuant to § 12-15-319(a), Code of Alabama, 1975, that the ... father [is] unable to discharge [his] responsibilities to and for the child due to [his] conduct and conditions and that such conduct and conditions are unlikely to change soon.

>> "'The Court does find, pursuant to § 12-15-319(a)(1), Code of Alabama, 1975, the ... father ha[s] failed to visit with the minor and maintain consistent contact or attempts to contact the child or to contact DHR to arrange visitation with the child.

>> "'The court finds that ... [the] father pursuant to § 12-15-319(a)(1), Code of Alabama, 1975, ha[s] not made attempts to arrange consistent visitation with [the child] and the living

conditions said minor would be exposed to are not in her best interest.

"'The court finds, pursuant to § 12-15-319(a)(10), Code of Alabama, [1975,] that the ... father ... ha[s] failed to provide for the material needs of the child. The court finds, pursuant to § 12-15-319(a)(12) Code of Alabama, 1975, that the ... father has failed to adjust [his] circumstances to meet the needs of the child.

"'The court finds that 'DHR' has made reasonable efforts to locate relative resources for placement of the child. 'DHR' investigated all known relatives provided by the mother and father and independently identified relative resources for placement of the child have not yielded positive results. Relatives that were located are not suitable to take care of the minor child. 'DHR' did not find an interested or viable relative placement option for the child. The court finds there are not viable relative resources ready willing or able to receive custody of the child at the date of the termination trial.'

"On December 15, 2023, the father timely filed a postjudgment motion to alter, amend, or vacate or, in the alternative, for a new trial. On December 18, 2023, the juvenile court denied the father's postjudgment motion. The father filed his notice of appeal to this court on December 29, 2023."

B.T., ___ So. 3d at ___ (footnotes omitted). In appeal number CL-2023-0944, this court reversed the juvenile court's judgment and remanded the case with instructions. B.T., ___ So. 3d at ___. Specifically, we instructed

3

the juvenile court to vacate certain factual findings and then to "reconsider whether the petition to terminate the father's parental rights should be granted or denied in the absence of those findings." Id. at ___. On September 13, 2024, DHR filed in the Alabama Supreme Court a petition for writ of certiorari to this court. On October 11, 2024, the Alabama Supreme Court denied DHR's petition, without opinion. See Ex parte Jefferson Cnty. Dep't of Hum. Res., [Ms. SC-2024-0598, Oct. 11, 2024] ___ So. 3d ___ (Ala. 2024). On that same day, this court issued the certificate of judgment in appeal number CL-2023-0944.

On December 4, 2024, the juvenile court entered an amended final judgment terminating the parental rights of the father to the child. The juvenile court's amended final judgment provides:

"On August 30, 2024, the Alabama Court of Civil Appeals reversed this Court's December 11, 2023, Order terminating the parental rights of … the father as to [the child]. It should be noted that … the mother[] did not appeal this Court's judgment and her parental rights were and remain terminated. The Alabama Court of Civil Appeals remanded the cause to this Court with the following instructions:

"[']On remand, the juvenile court shall vacate the findings that the father failed to maintain consistent visitation and contact with the child and that the father failed to provide for the material needs of the child. The juvenile court shall then reconsider whether the petition to

4

terminate the father's parental rights should be granted or denied in the absence of those findings. Upon reconsideration, the juvenile court shall then enter a new judgment reflecting its decision.[']

"In compliance with the appellate court's instructions, this Court's December 11, 2023[,] findings that the father failed to maintain consistent visitation and contact with the child and that the father failed to provide for the material needs of the child are hereby VACATED.

"In compliance with the appellate court's instructions, this Court has reconsidered the entirety of the evidence presented at the November 8, 2023[,] trial, for which the father failed to appear despite being personally served with the petition but was represented by counsel and a Guardian ad litem. This Court considered the ore tenus testimony of multiple witnesses, including an expert in the field of infectious disease who has treated [the] child's HIV diagnosis since her birth, as well as certain properly authenticated and relevant exhibits. This Court finds that, even in the absence of its vacated findings, [DHR's] petition to terminate the father's parental rights is due to be GRANTED.

"This Court finds from clear and convincing evidence, competent, material, and relevant in nature, that the father is unable or unwilling to discharge his responsibilities to and for the child, and that his conduct or condition renders him unable to properly care for the child[,] and that the conduct or condition is unlikely to change in the foreseeable future. In reaching its decision, this Court has considered the evidence presented, the best interests of the child, and those enumerated factors set forth in Ala. Code []1975[,] § 12-15-319(a). This Court specifically finds that, pursuant to Ala. Code § 12-15-319(a)(12), the father has failed to adjust his circumstances to meet the needs of [the] child. As such, grounds for termination of the father's parental rights exist.

"This Court has considered all known alternatives to termination and rejects the same as not being viable or in the best interests of [the] child. [DHR] investigated all known relative resources, and none are suitable for placement of [the] child and therefore not viable alternatives. This Court specifically rejects maintenance of the status quo because such is contrary to the child's best interests and therefor[e] not a viable alternative. This Court finds that there are no viable alternatives to termination of the father's parental rights.

"This Court finds that termination of the father's parental rights and adoption by current foster parents is in the child's best interests. [The] child can and will achieve permanency through adoption, and [the] child deserves the permanency that adoption by her current foster parents will provide her.

"It is therefore ORDERED, ADJUDGED, and DECREED as follows:

"1) That [the child] is a DEPENDENT child.

"2) That grounds for termination of the father's parental rights exist.

"3) That there are no viable alternatives to termination of parental rights.

"4) That [DHR] has made reasonable and consistent efforts to promote reunification between the child and the father, but that reunification with the father is not in the child's best interests.

"5) That [DHR]'s petition to terminate the father's parental rights has been proven by clear and convincing evidence and is hereby GRANTED.

6

"6) That [the father]'s parental rights are hereby PERMANENTLY SEVERED AND TERMINATED as to [the child].

"7) That PERMANENT LEGAL CUSTODY of [the child] is hereby vested in [DHR] for permanent placement and adoption.

"8) That pursuant to Ala. Code § 12-15-321[,] this child's case shall be set for a permanency review December 6, 2024[,] @ 08:30 a.m."

(Capitalization in original; emphasis omitted). On December 9, 2024, the father filed a motion to alter, amend, or vacate the judgment, or in the alternative, for new trial. That motion was denied by the juvenile court on December 11, 2024. On December 17, 2024, the father timely filed his notice of appeal to this court.

## Evidence

Deshaunda Cooper, a social service caseworker with DHR, testified that she was assigned to the case shortly after the child's birth in August 2021. She testified that, on August 5, 2021, DHR received a report that the mother had given birth to the child and that the mother had not received any prenatal care. Cooper further testified that there were concerns of alleged domestic violence, substance abuse, and an untreated mental-health diagnosis of schizophrenia for the mother. According to

7

Cooper, DHR became involved with the family in January 2016 after receiving a report that the father had spanked one of his children, leaving excessive marks and bruises on that child's buttocks and thighs; the father was found "indicated" for physical abuse and charged with domestic violence in the third degree.

Cooper testified that both the mother and the father admitted that they had been involved in an incident of domestic violence with one another. Therefore, the mother and the father were ordered to complete domestic-violence and anger-management classes. According to Cooper, the father completed both those requirements.

Cooper testified that, after the mother admitted to Cooper that she and the father had smoked marijuana together, the father was court ordered to submit to random drug screens twice a month; DHR paid for the screens. According to Cooper, the father submitted to random drug testing only once, and the father's test was negative. Cooper testified that the father told Cooper that "there was no need for him to test and [that] he felt like he did not have to test based on just allegations from [the mother]."

8

Cooper testified that, during a home visit with the father on the day before the trial, she found a marijuana "roach" on the floor of the father's bedroom and cigar fillings on the top of his dresser. According to Cooper, the father stated that he sometimes had friends at his home who smoked marijuana. Further, Cooper testified that she found another piece of marijuana on the bathtub; the father told Cooper that what Cooper had found was actually "fake weed" that the mother smoked. Cooper testified that the drugs found had been within the reach of a child.

Cooper testified that the father had been ordered to obtain employment but that he was not employed at the time of the trial. Cooper testified that, the day before the trial, the father stated that he had begun working with a temporary employment service called Staff Zone but that he had not yet been offered employment.

Cooper testified that the father completed parenting classes in 2021; however, she still had concerns about his ability to parent the child. According to Cooper, her concerns with the father's parenting abilities were based on the father not completing court-ordered services, how he had displayed his parenting skills in visitations with the child, and his prior history with DHR.

9

Mikki Bendt, an employee of Covenant Services, testified that, as part of her employment, she had worked with the mother, the father, and the child to facilitate visitations and transportation. According to Bendt, she supervised visits between the child and the father every week in the months leading up to the trial. Bendt testified that the mother and the father argued and cussed at each other during their joint visits. According to Bendt, even at their separate visits, the mother and the father would

> "call one another on the phone, and they would do it by phone call or [the videoconferencing service] Facetime to the point that, you know, you would have to threaten to end the visitation if they did not stop the phone calls because they would focus more on arguing and yelling at one another th[a]n paying attention to the baby."

Bendt further testified that she observed concerning behavior between the father and the child during their visits. According to Bendt, the father kissed the child with his eyes closed, and his kisses lingered for an extended period of time with his lips on the child's forehead, head, cheek, neck, face, and lips; Bendt testified that these kisses were "very uncomfortable" to watch. She testified that she attempted to correct the father but that he told her not to tell him what to do.

Bendt also testified that the father brought the paternal grandmother with him to visits and argued with her to the point that Bendt "had to make the [paternal grand]mother leave because they started to yell and scream and cuss at one another" while the child was in the room. According to Bendt, she was concerned with the father's behavior during visits because the father became angry at the child "over small things that for her age would be things you shouldn't get angry like that over." Bendt testified that, at a visit a few weeks before the trial, the child

> "was playing and she didn't come to him like he wanted her to, so he grabbed her by the arm and brought her to him. He didn't like yank her, but it was enough to -- I mean, she -- her whole demeanor went from she was playing to she instantly had a look of fear on her face, had tears in her eyes. He told her she was being disrespectful, that per the Bible it says the child is to respect her mother and father and he was tired of her not listening to him. …"

According to Bendt, the child cried, and the father did not console her in any way. She testified that she redirected the father, and he stated that he did not need her "to tell him how to parent his child." Bendt testified that she told the father that she was there to help guide him and to make sure he was doing what he needed to do so that everyone can be assured

11

that he can take care of the child; the father responded that he did not have to prove anything to anybody.

Bendt testified that she encouraged the father to be more involved in playing with the child during visits by bringing coloring books and toys. According to Bendt, at visits, the father usually sat at a table using his cellular telephone and interacted with the child on only a few occasions. Bendt testified that the father "told [the child] that he's going to whoop her butt and that once they're home, she's not going to have to worry about anybody stopping him from whopping her butt." When asked if Bendt has observed any improvements in the father's interactions with the child, Bendt testified that there had never been a full progression and that "[i]t was just kind of a teeter-totter back and forth. Further, when asked if she would be comfortable with the father being alone with the child in a DHR playroom after two years of observing visits, Bendt testified that she would not because she feels "if he doesn't have someone there to keep him from going over the top, he's -- if he doesn't have that buffer, he's going to go over t[he] top." She went on to clarify that she was referring to the father's angry behavior towards the child and his methods of discipline described above.

12

Dr. Joshua Cooper, a physician at Children's Hospital, testified that the child is one of his patients. Dr. Cooper testified that the child, who tested positive at birth for HIV, has been placed on a strict drug regimen to ensure that the virus may not mutate. According to Dr. Cooper, the child's HIV status has become "undetectable" through that strict drug regimen. Dr. Cooper testified that the father has attended only two of the child's doctor's appointments and that the father had little engagement in managing the child's medical issues. Deshaunda Cooper testified that, although she had encouraged the father to attend the child's doctor's appointments, he had not attended or given a reason for his failure to attend. She testified that, on the day before the trial, the father stated that he was going to try to attend more medical appointments and to learn how to properly administer the child's medication.

Cooper testified that, based on her evaluation of the father's home the day before the trial, the father's home would not be approved for the child's placement. She testified that she was concerned about the father's ability to exercise protective capacities for the child based on his housing, employment, history of domestic violence, and the "indicated" finding

13

against him for physical abuse of another child. Cooper further testified that she had observed nothing to show that the father had adjusted his circumstances to meet the child's specific needs.

According to Cooper, there were no relative resources available to take custody of the child. Cooper testified that the maternal grandmother was not an appropriate relative resource because she had been found "indicated" for child abuse and neglect and lacked stable housing. Cooper also testified that the paternal grandmother was not an appropriate relative resource because she also had been found "indicated" for child abuse and neglect. Cooper testified that the father had two biological siblings who had reached out to DHR stating that they would be receptive to becoming a relative resource for the child. However, according to Cooper, the father's sister later stated that the child's medical history would be too much for her to commit to managing, and the father's brother stated that he did not want to deal with the father.

C.F., the child's foster mother, testified that the child had lived with her and her husband since the child was nine days old; the child was two years and three months old at the time of the trial. C.F. testified that she and her husband had 3 other children in the home who were 10, 13,

and 15 years old, respectively. According to C.F., the child's medication regimen is challenging. She testified that, at each doctor's appointment, they learned to take care of the child, including any medication and dosage changes.

C.F. testified that, at the doctor's appointment the father attended, the child "was comfortable, but [the child] definitely did not want [her husband or her] to leave the room. And when [the child's] blood was being drawn or she was insecure, she wanted to sit in [C.F.'s] lap." According to C.F., the father has not requested information concerning the child's medical appointments or medication.

According to M.F., the child's foster father, he and C.F. live approximately 15 minutes from Children's Hospital, and Dr. Cooper has provided the family with his cellular-telephone number and is "extraordinarily available" to them. According to M.F., he and C.F. have cultivated a relationship with the child's pharmacist, who, he testified, has been a "tremendous" resource. He testified that "[w]e can email her an up-to-date weight sometimes and she will change the dose for us without us having to come into the clinic."

CL-2024-0982

M.F. testified that they have enjoyed having the child as a part of their family. According to M.F., the child is full of joy, smart and engaging, loves people, and fits right in with their family. The child has her own room at the foster parents' home, and they consider the child to be a member of their family. M.F. testified that the child is "most definitely" part of their family, and they want to adopt her. C.F. testified "we're in love with her. She's adored."

Standard of Review

"A judgment terminating parental rights must be supported by clear and convincing evidence, which is '"'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'"' C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'"[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly … establish the fact sought to be proved."

16

"'KGS Steel, Inc. [v. McInish], 47 So. 3d [749,] 761 [(Ala. Civ. App. 2006)].

"'… [F]or trial courts ruling … in civil cases to which a clear-and-convincing-evidence standard of proof applies, "the judge must view the evidence presented through the prism of the substantive evidentiary burden[,]" [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'

"Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id."

M.W. v. Marshall Cnty. Dep't of Hum. Res., 399 So. 3d 287, 290-91 (Ala. Civ. App. 2024).

## Discussion

### I. Grounds for Termination

On appeal, the father first argues that the juvenile court's judgment terminating his parental rights to the child was not supported by clear

17

and convincing evidence. Section 12-15-319, Ala. Code 1975, provides, in

pertinent part:

> "(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[] of a child [is] unable or unwilling to discharge [his] responsibilities to and for the child, or that the conduct or condition of the parent[] renders [him] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[]. In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child. In determining whether or not the parent[] [is] unable or unwilling to discharge [his] responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
>
> > "....
>
> > "(12) Lack of effort by the parent to adjust his … circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."

In this case, there was evidence presented that the father was court

ordered to submit to random drug screens twice a month. However, after

submitting to only one drug screen, the father told Cooper that "there

was no need for him to test and he felt like he did not have to test based

on just allegations from [the mother]." Cooper testified that, at a home

18

visit the day before the trial, she found a marijuana "roach" on the floor of the father's bedroom and a piece of marijuana on the father's bathtub. Further, Cooper testified that the father admitted that he sometimes had friends at his home who smoked marijuana.

Evidence presented at trial indicated that the father was also ordered to obtain employment but that he was still not employed at the time of the trial. Although the father completed parenting classes in 2021, Cooper testified that she still had concerns with the father's ability to parent the child. Bendt also testified that she would not be comfortable with the father being alone with the child. According to Bendt, during visits, the mother and the father argued and cursed. Moreover, the father told the child that, once the child was at home and he had no one to stop him, he would "whoop her butt." There was also evidence that the child was on a strict medication regimen for HIV and that the father had failed to attend most of the child's doctor's appointments.

Considering the evidence presented that the father had failed to attend court-ordered drug screens, had continued to have marijuana in his home, had not obtained employment, had failed to engage in the child's medical treatment, and failed to improve his ability to parent the

child even after completing parenting classes, the juvenile court could have been reasonably convinced that the father had failed to adjust his circumstances to meet the needs of the child. See § 12-15-319(a)(12), Ala. Code 1975. Therefore, we cannot conclude that the juvenile court exceeded its discretion in determining that the father was "unable or unwilling to discharge [his] responsibilities to and for the child, or that the conduct or condition of the [father] renders [him] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future." See § 12-15-319(a).

## II. Viable Alternatives

The father also argues that the juvenile court erred in determining that DHR sufficiently explored viable alternatives to the termination of his parental rights. Specifically, the father appears to argue that DHR failed to explore relative resources for placement of the child and that maintaining the status quo was a viable alternative to the termination of his parental rights.

> "It is well settled that a noncustodial parent continues to maintain a fundamental right to a legal relationship with his or her child. See McQuinn v. McQuinn, 866 So. 2d 570, 572 (Ala. Civ. App. 2003). A juvenile court may only interfere with that fundamental right using the most narrowly tailored means to achieve the State's compelling interests. See Roe v.

Conn, 417 F. Supp. 769 (M.D. Ala. 1976). Only two interests have been identified as sufficiently compelling to justify a termination of parental rights: the protection of children from parental abuse or neglect and the advancement of the children's need for a permanent custodial arrangement. See Ex parte Bodie, 377 So. 3d 1051, 1065 (Ala. 2022) (Parker, C.J., concurring in part and concurring in the result)."

R.D. v. G.A.W., [Ms. CL-2024-0344, Nov. 1, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024).

"Once the court determines that termination of the parent's parental rights advances a compelling governmental interest, the court then must consider whether the government seeks to advance its interest in a manner that infringes the parent's parental rights in the narrowest manner possible. See Montgomery Cnty. Dep't of Hum. Res. v. N.B., 196 So. 3d 1205, 1214 (Ala. Civ. App. 2015) ("'A state may only interfere with [parental rights] to achieve a compelling governmental objective using the most narrowly tailored means available. Roe v. Conn, 417 F. Supp. 769 (M.D. Ala. 1976).'" (quoting J.B. v. DeKalb Cnty. Dep't of Hum. Res., 12 So. 3d at 115 (plurality opinion))); § 26-1-6(b)[, Ala. Code 1975]. "[I]f a court may achieve the compelling governmental objective at stake through a means other than the drastic action of permanently revoking the custodial rights of the parent, a juvenile court cannot terminate parental rights." J.G. v. Lauderdale Cnty. Dep't of Hum. Res., 379 So. 3d 444, 447 (Ala. Civ. App. 2023). A juvenile court applies this "narrowly tailored" analysis by considering whether there exists any viable alternative to termination of parental rights to achieve the government's compelling interest. See Ex parte Bodie, 377 So. 3d at 1064 (Parker, C.J., concurring in part and concurring in the result); S.P. v. Madison Cnty. Dep't of Hum. Res., 315 So. 3d 1126, 1131 (Ala. Civ. App. 2020); J.B. v. DeKalb Cnty. Dep't of Hum. Res., 12 So. 3d at 115 (plurality opinion)."

M.P. v. DeKalb Cnty. Dep't of Hum. Res., 394 So. 3d 1080, 1086-87 (Ala. Civ. App. 2023). "[I]f some less drastic alternative to termination of parental rights can be used that will simultaneously protect the children from parental harm and preserve the beneficial aspects of the family relationship, then a juvenile court must explore whether that alternative can be successfully employed instead of terminating parental rights." T.D.K. v. L.A.W., 78 So. 3d 1006, 1011 (Ala. Civ. App. 2011). Further, as a general rule, "'maintaining a child in indefinite foster care is not a viable alternative to termination of parental rights.'" T.W. v. Calhoun Cnty. Dep't of Hum. Res., 391 So. 3d 306, 316 (Ala. Civ. App. 2023) (quoting T.L.S. v. Lauderdale Cnty. Dep't of Hum. Res., 119 So. 3d 431, 439 (Ala. Civ. App. 2013) (plurality opinion)).

Here, Cooper testified that there were no relative resources available to take custody of the child. Both the maternal grandmother and the paternal grandmother had been found "indicated" for child abuse and neglect. Moreover, the maternal grandmother did not have stable housing. Cooper testified that the father's sister stated that the child's medical history would be too much for her to commit to and that the father's brother stated that he did not want to deal with the father.

22

Therefore, we cannot conclude that that the juvenile court erred in finding that no known relative resource existed that would serve as a suitable placement for the child.

With respect to maintaining the status quo, evidence was presented indicating that, although the father had completed parenting classes and maintained visitation with the child, both Cooper and Bendt had concerns about the father's behavior during those visits. In fact, Bendt did not think the father should be left alone with the child. Further, evidence was presented indicating that the child, who was two years and three months old at the time of trial, had been with the foster parents since she was nine days old. The foster parents testified that they have bonded with the child, consider the child to be a member of their family, and plan to adopt the child. Based on the evidence presented, we cannot conclude that the juvenile court erred in determining that maintaining the status quo was not a viable alternative to the termination of the father's parental rights.

Having rejected the father's arguments with respect to viable alternatives, we affirm the juvenile court's finding that there were no viable alternatives to termination of the father's parental rights.

## Conclusion

Based on the foregoing, the judgement of the juvenile court terminating the parental rights of the father to the child is affirmed.

AFFIRMED.

Moore, P.J., and Edwards, Hanson, and Fridy, JJ., concur.